# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES, | : |
|                   Plaintiff, | : Crim. No. 93-536 (RBK) |
| v. | : **OPINION** |
| RICHARD BALTER, | : |
|                   Defendant. | : |

**KUGLER**, United States District Judge:

**THIS MOTION** comes before the Court upon Defendant Richard Balter's Motion for Reduction of Sentence as amended by the First Step Act (the "Motion" or "Mot.") (ECF No. 128), pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons set forth below, Balter's Motion is **DENIED**.

## I. BACKGROUND

### A. Procedural Background

Balter is an inmate in federal custody at Federal Correctional Institution Butner Medium I ("FCI Butner") in Butner, North Carolina. (ECF No. 133, Def. Reply, at 2). In September 1994, the Court sentenced Balter to life in prison for murder-for-hire, in violation of 18 U.S.C. §§ 1958 and 2, and three concurrent terms 60 months in prison for mail fraud, in violation of 18 U.S.C. § 1341. (ECF No. 131, Gov't Opp'n, at 4).

Balter filed his first Motion for Reduction of Sentence on June 8, 2020, amid the Covid-19 pandemic. (ECF No. 77). After a hearing on the record, the Court denied that motion on

1

August 11, 2020. (ECF No. 89). Subsequently, on April 6, 2022, Balter requested compassionate release from the warden of FCI Fairton, where he was previously housed. (Gov't Opp'n, Ex. A at 1–2). The warden denied that request on Oct. 14, 2022. (*Id.*). Then, on Feb. 23, 2023, Balter filed the current motion with the Court. (Mot.) The United States opposed Balter's motion on April 18, 2023, (Gov't Opp'n), to which Balter replied on July 18, 2023. (Def. Reply).

**B. Factual Background**

1. The Offense

Balter formulated and oversaw a plan to kill a business associate to collect on the man's $600,000 life insurance policy and thereby save Balter's struggling business. (Presentence Report, or "PSR," ¶¶ 10-34).[1] On the morning of Jan. 20, 1993, two men paid by Balter shot the victim, Robert Cohen, three times outside his company in the Bronx, New York. (*Id.* ¶ 31). Cohen succumbed to his injuries roughly six weeks later, leaving behind a wife and two daughters, then ages 10 and 13. (Gov't Opp'n, Ex. C at 1, 4).

Balter's plot was several months in the making, and he had countless opportunities to abandon the plan before it was put into action. The impetus for the murder-for-hire scheme was the poor financial position of Balter's business, which was owed a significant amount of money by Cohen's business. (PSR ¶¶ 10–14). As a sign of good faith, Cohen agreed to take out a life insurance policy, naming Balter as the creditor-beneficiary. (*Id.* ¶ 15). As Balter's own creditors closed in, he and a business partner, Kenneth Cutler, went searching for someone who could kill Cohen. (*Id.* ¶ 17). In September 1992, Balter and Cutler met with Gustavo Gil, who agreed for a fee to help find them a killer, who would also be paid. (*Id.*). Over the next four months, Balter

---

[1] Balter's PSR is on file with the U.S. Probation Office in the District of New Jersey.

was the main force driving the plan forward. He told Gil that he wanted the crime to look drug-related and that the victim should be shot in the head. (*Id.*). He generated phony checks in preparation of paying Gil and the would-be killer. (*Id.* ¶¶ 18–19, 25). He repeatedly called Gil at his home to pressure him to find a killer more quickly. (*Id.* ¶ 20). After a hitman was contracted, Balter directed that Cohen's murder should not be delayed, and if Cohen showed up at work with someone else, the hitman should kill the second person as well. (*Id.* ¶ 23). Finally, after an aborted attempt to murder Cohen, Balter instructed Gil and the hitman to return to Cohen's business the next morning and try again. (*Id.* ¶¶ 28–30). This attempt to kill Cohen was successful. (*Id.* ¶¶ 31–32).

After attempting to collect on Cohen's life insurance policy, Balter then tried to evade detection by telling an employee to lie to investigators, attempting to secure false testimony from two different people, and offering to pay people to kidnap him from the courtroom during his trial. (*Id.* ¶¶ 40–51). Balter's Presentence Report notes that he received an upward adjustment to his baseline offense level under the U.S. Sentencing Guidelines ("U.S.S.G." or "the Guidelines") as an "organizer or leader" of the crime and for his several attempts to obstruct justice. (*Id.* ¶¶ 40–52).

      2.  <u>Balter's Incarceration and Deteriorating Health</u>

Balter, now 76, has been incarcerated since November 1993. (Mot. at 6). Since entering prison, he has experienced a litany of medical problems, including coronary artery disease, ischemic heart disease, degenerative disc disease, type II diabetes, glaucoma, osteoarthrosis, and macular degeneration. (*Id.*). Balter is legally blind in both eyes and uses a walker to move around, requiring assistance for even basic tasks. (*Id.*). He has suffered several heart attacks in his life, (*id.* at 7), and two strokes, the second of which occurred in the past year and rendered

3

him unable to open his left eye without using his hand. (Def. Reply at 4). Balter claims that at least some of his loss of vision is due to negligence by the Federal Bureau of Prisons ("BOP"), as substantiated by a Federal Tort Claims Act judgment in Balter's favor stemming from a failure to provide him timely care in 2007. (Mot. at 7; *Balter v. United States*, No. 3:09-cv-1409 (M.D. Pa. 2009) (ECF No. 141)).

The parties disagree about Balter's ability to provide self-care within prison and whether Balter has refused medical services. According to the Government, Balter's medical ailments are "well-controlled" such that Balter can adequately care for himself with the medical treatment and support that BOP is providing. (Gov't Opp'n at 7). The Government points to the letter from the warden of FCI Fairton, dated Oct. 14, 2022, denying Balter's second request for compassionate release, which reads: "Your current medical conditions can be limiting, but you are able to address normal living needs with minimal assistance. You are not confined to a bed and able to program, including attending food service." (Gov't Opp'n, Ex. A at 2). The Government also asserts that Balter has skipped or refused several recent medical procedures and vaccinations. (Gov't Opp'n at 8).

Balter adamantly disputes these characterizations. He claims that, at the time of filing his reply, he did not have an inmate companion to help him with his daily needs and was housed in a cell too narrow to fit his walker. (Def. Reply at 5). Contrary to the Government's contentions, Balter states that he has never refused medical treatment. (Def. Reply at 2). In fact, he claims he has been denied requested treatment, does not receive regular disbursements of prescription medication, and has had to endure prolonged delays to see specialists and receive tests. (Def. Reply at 3-4). Balter points to a 2014 memo by the BOP's then-medical director, who wrote that "Mr. Balter meets BOP [Reduction In Sentence] criteria by virtue of having multiple co-morbid

4

medical conditions, which despite maximal medical improvement and optimal treatment, will continue to deteriorate and diminish his ability to function in a correctional facility."[2] (Mot., Ex. F at 1). Overall, according to Balter, he lacks adequate support in prison to care for himself or to treat his numerous medical conditions, and he should be released from prison to pursue care at U.S. Department of Veterans Affairs facilities, where he is entitled to treatment as a veteran. (Mot. at 3, 8). Balter argues that the present motion is distinguishable from his previous request in 2020 due to the further deterioration of his health and the insufficiency of available medical care. (*Id*. at 2).

### 3. Letters For and Against Balter's Release

Letters were submitted both for and against Balter's motion. Cohen's widow, nephews, and one of his daughters wrote letters to oppose Balter's 2020 motion for compassionate release, which the Government resubmitted in opposition to the present motion "because the family's feelings remain unchanged." (Gov't Opp'n at 10, Ex. C). Balter submitted seven letters total from several friends, fellow inmates, and a former Pennsylvania state judge encouraging his release. (Def. Reply, Ex. 5-8, 10-12).

## II.   LEGAL STANDARD

The changes implemented by the First Step Act allow prisoners to directly petition the court, as opposed to the BOP, for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A). First, however, prisoners must satisfy the exhaustion requirements laid out in that statute. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. 2020). To exhaust administrative remedies, a defendant must present his request for compassionate release to the warden of the facility where

---

[2] The Government disagrees with this conclusion. (Gov't Opp'n at 8 n.3).

he is housed. *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Thirty days after submitting the request or after exhausting all administrative appeal rights, whichever is earlier, the defendant may move for compassionate release in the district court. *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020).

A district court may reduce a defendant's term of imprisonment "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A). The sentencing factors under 18 U.S.C. § 3553(a) require courts to consider, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant. *Id.* "Compassionate release is discretionary, not mandatory; therefore, even if a defendant is eligible for it, a district court may deny compassionate release upon determining that a sentence reduction would be inconsistent with the § 3553(a) factors." *United States v. Alexander*, 2023 WL 4198042, at *1 (3d Cir. June 27, 2023); *see also United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (district court acted within its discretion to deny compassionate release based on the § 3553(a) factors even where the Government did not dispute that extraordinary and compelling reasons were present). The defendant bears the burden of showing that he is entitled to compassionate release. *United States v. McNair*, 481 F. Supp. 3d 362, 365 (D.N.J. 2020).

"Extraordinary and compelling reasons" are not defined by statute. Rather, Congress tasked the U.S. Sentencing Commission ("the Commission") with providing further guidance.

6

28 U.S.C. § 994(t).³ The Commission provided such guidance in a policy statement that appears at § 1B1.13 of the Guidelines. A court may reduce a term of imprisonment "if, after considering the factors set forth in 18 U.S.C. § 3553 . . . extraordinary and compelling reasons warrant the reduction" and "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13. In a corresponding Application Note, the Commission enumerated three specific circumstances that qualify as "extraordinary and compelling":

> (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver.

*Rodriguez*, 451 F. Supp. 3d at 396 (paraphrasing U.S.S.G. § 1B1.13, cmt. n.1(A)-(C)). In subsection (D) of the Application Note to U.S.S.G. § 1B1.13, a catchall provision gives the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

In its current form, U.S.S.G. § 1B1.13 expressly applies only to motions filed by the Director of the BOP, not motions filed by defendants. Accordingly, the Third Circuit has held that § 1B1.13's definition of "extraordinary and compelling reasons" does not bind courts when considering prisoner-initiated motions. *United States v. Andrews*, 12 F.4th 255, 259 (3d Cir.

---

³ Congress's only instruction to the Commission was that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

2021), *cert. denied*, 142 S. Ct. 1446 (2022). Nonetheless, § 1B1.13 "still sheds light on the meaning of extraordinary and compelling reasons" and can provide a useful guide for courts considering compassionate release motions. *Id.* at 260 ("[T]he District Court did not err when it consulted the text, dictionary definitions, and the policy statement to form a working definition of 'extraordinary and compelling reasons.'").

The Court also notes that the Commission on April 27, 2023, proposed amendments to the Guidelines that would expand § 1B1.13 to apply to prisoner-filed motions. Sentencing Guidelines for the United States Courts, 88 Fed. Reg. 28254, 28254–56 (May 3, 2023). These amendments would also add to the list of extraordinary and compelling reasons that can warrant a sentence reduction. *Id*. Most relevant to this case, an additional reason would be that "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id*. at 28254. Unless Congress modifies or rejects the Commission's proposed amendments, the amendments will take effect Nov. 1, 2023. *Id*.

### III.   DISCUSSION

The Government does not dispute that Balter exhausted his administrative remedies. Balter sought compassionate release from FCI Fairton's warden, and the warden subsequently denied Balter's request. (ECF No. 131, Ex. A at 1–2). Thus, the Court will proceed to the merits of Balter's motion. Even assuming for the purposes of this opinion that Balter can demonstrate that his deteriorating health constitutes an extraordinary and compelling reason for his release and that he would not pose a danger to the public, a sentence reduction would be inconsistent with the § 3553(a) factors.

The Court is willing to assume for the purposes of this opinion that Balter's worsening health could constitute extraordinary and compelling reasons to reduce his sentence. Balter attempts to make a showing, first, that he meets the description of extraordinary and compelling reasons provided in Application Note (1)(A)(ii)(I) to § 1B1.13: "The defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Alternatively, if the Commission's proposed amendments to § 1B1.13 take effect on Nov. 1, 2023, Balter could argue that he "is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." 88 Fed. Reg. 28254. Balter has several irreversible medical conditions that require intensive care and monitoring. He has suffered several heart attacks and at least two strokes. He is blind, limiting his ability to perform basic tasks without assistance and to navigate his physical environment in prison. He claims that the BOP medical system has failed him, as shown by the civil judgment against the BOP, and continues to fail him through denied treatment requests, irregular disbursement of prescription medication, and delayed care. The Court is sympathetic to Balter's arguments that his various medical conditions make it difficult for him to care for himself in prison and that certain medical care he believes is necessary is difficult to access.

Similarly, the Court assumes for the purposes of this opinion that Balter is not a danger to the safety of any other person or to the community. U.S.S.G. § 1B1.13(2). Balter directed the murder-for-hire scheme for which he is incarcerated without physically carrying out the killing himself. However, Balter argues that his age and medical conditions make him an unlikely candidate to commit other crimes were he released. (Mot. at 12–13). Balter also cites his

9

incident-free prison disciplinary record, completion of training programs in prison, remorse, and lack of financial incentive as evidence that he has been rehabilitated and no longer poses a threat to the public. (*Id.*).[4]

The Court finds, however, that releasing Balter is not appropriate upon consideration of the § 3553(a) factors. A reexamination of the nature and circumstances of Balter's offense, 18 U.S.C. § 3553(a)(1), reveal it to be an especially heinous crime. Balter's unabashed avarice for $600,000 in life insurance proceeds motivated the murder of Robert Cohen, a middle-aged father of two. Balter pushed the plot forward at every turn, pressuring an associate to find a killer, using fraudulent checks to pay the hitmen, and directing the hitmen to try again after an aborted attempt to kill Cohen. At one point, Balter suggested that the killer also murder Cohen's co-worker if Cohen was not alone, illustrating Balter's disregard for human life. After Cohen's death, Balter tried to both collect on Cohen's life insurance policy and evade responsibility. In four discrete instances of obstruction of justice, Balter tried to hinder the investigation into Cohen's murder and the prosecution that ultimately landed him in prison.

Given the nature and circumstances of Balter's offense, the Court is mindful of the need for the sentence imposed to reflect its seriousness, promote respect for the law, provide just punishment, and afford adequate deterrence. 18 U.S.C. § 3553(a)(2)(A)–(B). The Court acknowledges the words of apology that Balter offers to the Cohen family as part of his motion. (Mot., Ex. H). However, we agree with the Government that Balter's release would send the wrong message to the public about the gravity of his offense. Murder-for-hire is a reprehensible

---

[4] The Court again notes that rehabilitation, by itself, cannot be considered an extraordinary and compelling reason for release. 28 U.S.C. § 994(t); *see also* U.S.S.G. § 1B1.13, cmt. n.3.

crime that Balter pursued for his own economic benefit. No amount of money can excuse the devastating impact that Balter's actions have had on Cohen's family, which has endured many years now without an uncle, husband, and father. Cohen's family members who have submitted letters to the Court oppose Balter's release. (Gov't Opp'n at 10, Ex. C). Similarly, the Court believes that denying Balter's motion best promotes respect for the law, provides just punishment, and sends the message to society at large that the justice system will respond aggressively to crimes of this nature.

As noted, this Court has the discretion to deny a compassionate release motion based on the § 3553(a) factors even where a defendant can show that extraordinary and compelling reasons support his release. *See Alexander*, 2023 WL 4198042, at *1. The Government points to other cases in which defendants with serious medical conditions were denied compassionate release for this very reason. *See United States v. Logan*, 2020 WL 730879, at *3 (W.D. Ky. Feb. 13, 2020) (denying reduction in sentence for 81-year-old defendant with prostate cancer, glaucoma, blindness, and diabetes who started hotel fire that killed four people); *United States v. Levine*, 2020 WL 2537786, at *4 (N.D. Ind. May 19, 2020) (denying reduction for 78-year-old defendant with advanced heart disease, Non-Hodgkin's B-Cell Lymphoma, rheumatoid arthritis, and a lung condition serving life sentence in murder-for-hire scheme); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (affirming the denial of compassionate release for a 62-year old defendant with terminal liver cancer due to the serious nature of his drug crime and criminal history). Here, given the heinousness of Balter's actions, the § 3553(a) factors override any extraordinary and compelling reasons Balter can present in favor of his release.

## IV. CONCLUSION

For these reasons, Balter's Motion (ECF No. 128) is **DENIED**. An Order follows.

Dated: 09/27/2023

ROBERT B. KUGLER
United States District Judge